1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ARCHIE LEE DREW, III,

11            Petitioner,              No. CIV S-03-1454 FCD KJM P

12        vs.

13   ALLEN SCRIBNER, Warden,

14            Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16            Petitioner is a state prison inmate proceeding with counsel with a petition for a

17   writ of habeas corpus under 28 U.S.C. § 2254, challenging his Sacramento County conviction on

18   a number of sex offense charges including rape and sodomy.  He raises four issues: (1) he was

19   denied due process when the court refused to instruct the jury on a good faith reasonable belief in

20   the victim's consent; (2) he was denied due process by the court's exclusion of his former

21   psychologist's testimony; (3) the prosecutor committed misconduct by arguing that petitioner

22   was mentally normal; and (4) he was denied due process when the court excluded evidence

23   suggesting that the victim had the ability to refuse unwanted sexual contact.

24   I.  Background

25            The Court of Appeal's factual summary adequately reflects the factual

26   background of this case as confirmed by this court's reading of the record:

1

1  Deanna is a mentally retarded young adult, who generally functions
   as a three-and-a half year old child.  She is unable to conceptualize
2  and is extremely compliant when directed to do something.  She
   was described at trial as being unable to say no to an adult.
3

4  In October 1999, defendant approached Deanna as she stood
   outside a store.  He took her behind the store and committed
5  various sex offenses on her.  He then took her to a motel where
   they met another man and additional sexual offenses were
6  committed.

7  Deanna's mother had reported Deanna missing, and a deputy
   sheriff found her later that night as she walked down the street with
8  defendant.

9  In response to the officer's question, Deanna said she had been
   touched, and an officer took Deanna to the hospital.  An
10 examination revealed the presence of sperm in the victim's vagina
   and anus.

11 An information charged defendant with nine counts, alleging rape,
   sodomy, oral copulation, oral copulation in concert, and genital
12 penetration with a foreign object.  Each of these offenses was
   alleged to have been committed against a victim who was
13 "incapable, because of mental disorder or developmental or
   physical disability, of giving legal consent to said act, and said
14 [defendant] knew or reasonably should have known of such
   condition."
15

16 Defendant did not dispute that he engaged in sexual acts with the
   victim but argued his own developmental disabilities precluded
17 him from recognizing the victim's disabilities.  He also suggested
   Deanna was, in fact, capable of giving her consent and had done
18 so.

19 The jury convicted defendant as charged.  The court found charged
   prior felony convictions to be true and sentenced defendant to an
20 aggregate prison term of 51 years.

21 Answer, Ex. E (Court of Appeal Opinion) at 2-3.

22 II.  Standards Under The AEDPA

23        An application for a writ of habeas corpus by a person in custody under a

24 judgment of a state court can be granted only for violations of the Constitution or laws of the

25 United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any

26 /////

claim decided on the merits in state court proceedings unless the state court's adjudication of the

claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as " § 2254(d)" or "AEDPA").  See Ramirez v. Castro,

365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief

under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth

Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538

U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did

not address the merits of petitioner's Eighth Amendment claim).[1]  Courts are not required to

address the merits of a particular claim, but may simply deny a habeas application on the ground

that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v.

Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district

courts to review state court decisions for error before determining whether relief is precluded by

§ 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief

by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

> The "contrary to" and "unreasonable application" clauses of § 2254(d)(1)  are

different.  As the Supreme Court has explained:

/////

---

[1]  In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . .  At best, it is constitutional dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71; Ramirez, 365 F.3d at 773-75.

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in <u>Williams</u> [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

<u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002). A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law. <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002).

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002), <u>cert</u>. <u>dismissed</u>, 538 U.S. 919 (2003). Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable. <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003). In other words, the court assumes the state court applied the correct law, and analyzes whether the decision of the state court was based on an objectively unreasonable application of that law.

It is appropriate to look to lower federal court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. See <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 598 (9th Cir. 1999).

/////

/////

III.  <u>Instruction On Good Faith Belief In Victim's Capacity To Consent</u>

Petitioner was charged with a variety of sex offenses against a victim incapable of giving her consent.  He argues that he was denied due process by the court's failure to give a modified "<u>Mayberry</u>"[2] instruction, telling the jury that a reasonable, good faith belief in Deanna's capacity to consent was an affirmative defense to the charges.  The Court of Appeal rejected the claim:

> . . . The instructions that were given here conveyed clearly to the jury that defendant could be found guilty only if he knew, or reasonably should have known, of the victim's incapacity.  If defendant could not reasonably have known the victim was incapable of consent, no crime was committed.  That is the proper framework to address this issue when the charged crimes do not involve forcible conduct.

> The issue here is not whether the victim gave her consent . . . –she did–the issue is whether the defendant knew, or should have known, she was legally incapable of doing so.  Defendant would have had the court instruct the jury that his reasonable and good faith belief that she was legally capable to consent was enough.  Of course, defendant's subjective belief that the victim could legally consent does not negate liability under the statutes.  Rather the question is whether he reasonably should have known she could not.  Admittedly, a jury that found that a defendant held a *reasonable* and good faith belief that the victim could legally consent could not logically find also that he *reasonably* should have known she could not.  Even so, although one can torture the concepts to the point where one can find theoretical overlap, the court instructed the jury in the language of the statutes he was accused of violating.  The language of those statutes–requiring as they do that one can be guilty only of the crimes they describe, if the person knew, or reasonably should have known, the victim could not legally consent to the sex acts that occurred–is clear, as are the instructions the court gave that repeat that language.  There was no error.

Answer, Ex. E at 16-17.

In <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984), the Supreme Court held explicitly that due process requires "criminal defendants be afforded a meaningful opportunity to present a complete defense."  Several Court of Appeals have interpreted this to encompass a

---

[2]  <u>People v. Mayberry</u>, 15 Cal.3d 143 (1975)

1  defendant's right to jury instructions on recognized defenses supported by sufficient evidence.

2  Taylor v. Withrow, 288 F.3d 846, 853 (6th Cir.); Bradley v. Duncan, 315 F.3d 1091, 1098-99

3  (9th Cir. 2002).  These courts have relied on the fact that the same rule is recognized in federal

4  criminal procedure:

5           As a general proposition a defendant is entitled to an instruction as
            to any recognized defense for which there exists evidence
6           sufficient for a reasonable jury to find in his favor.

7  Mathews v. United States, 485 U.S. 58, 63 (1988).   Accordingly, a state court's failure to

8  instruct on the theory of the defense may implicate a defendant's due process rights.  Bradley,

9  315 F.3d at 1099; Barker v. Yukins, 199 F.3d 867, 875-76 (6th Cir. 1999) (erroneous

10 self-defense instruction deprived the defendant of a meaningful opportunity to present a complete

11 defense).

12          In People v. Mayberry, 15 Cal.3d 143 (1975), one of the two defendants was

13 charged with kidnaping and forcible rape.  He argued that the trial court had erred in refusing to

14 instruct the jury on mistake of fact, that he reasonably believed the victim had consented to

15 accompany him and to have intercourse.  Id. at 153.  The court agreed that such an instruction

16 embodied the requirements of California Penal Code §§ 20 and 26, that "in every crime . . . there

17 must exist a union . . . of act and intent" and that one who acts under mistake of fact disproving

18 intent "is incapable of committing a crime."  As the California Supreme Court explained:

19
20          If a defendant entertains a reasonable and bona fide belief that a
            prosecutrix voluntarily consented to accompany him and to engage
            in sexual intercourse, it is apparent he does not possess the
21          wrongful intent that is a prerequisite under Penal Code section 20
            to a conviction of either kidnaping . . . or rape by means of force or
22          threat. . . .

23 Id. at 155.

24          In this case, however, the Court of Appeal found that under state law, a trial court

25 is not required to give a Mayberry instruction when a defendant is charged with sex offenses

26 against a person incapable of giving consent because of developmental disability.  Answer, Ex. E

6

at 17.    As a general rule, this court is bound by the Court of Appeal's interpretation:

> Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise . . . . This is the more so where, as in this case, the highest court has refused to review the lower court's decision rendered in one phase of the very litigation which is now prosecuted by the same parties before the federal court.

Hicks v. Feiock, 485 U.S. 624, 630 n.3 (1988) (internal quotations & citations omitted);

DiGuglielmo v. Smith, 366 F.3d 130, 137 (2d Cir. 2004) (when dispute concerns whether

instruction given contained everything required by state law, the federal court is "not empowered

to second-guess" the appellate court's ruling that the instruction complied with state law).

Petitioner urges this court to reject the Court of Appeal's determination and adopt

the contrary reasoning of the Court of Appeal for the Fourth Appellate District in People v.

Giardino, 82 Cal.App.4th 454 (2000), suggesting, it seems that Giardino shows how the

California Supreme Court will resolve the issue.

In Giardino, the defendant was convicted of rape of a person prevented from

resisting by reason of intoxication.  The court found the subdivisions of Penal Code section 261,

which criminalized intercourse with a person incapable of giving consent by reason of a mental

disability (§ 261 (a)(1)), and incapable of giving consent because of intoxication (§ 261 (a)(3)),

to be similar because

> [i]n both cases, the issue is not whether the victim actually consented to sexual intercourse, but whether he or she was capable of exercising the degree of judgment a person must have in order to give legally cognizable consent.

Id. at 462.  The court reversed for instructional error unrelated to the question of mistake of fact,

and "in accordance with [the] obligation to give guidance to the trial court in the event of a

retrial," concluded that the defendant would be entitled to a Mayberry-like instruction, focusing

the jury's attention on whether the defendant had an honest and reasonable, but mistaken, belief

1    that the victim was not too intoxicated to consent to intercourse.  Id. at 471-72.

2           The dicta in Giardino does not constitute "persuasive data" that the California

3    Supreme Court would require a jury to be instructed on a defendant's honest and reasonable

4    belief that a developmentally disabled person had the capacity to consent to intercourse.

5          The California Supreme Court has explained:

> 6   *Mayberry* is predicated on the notion that under section 26,
> reasonable mistake of fact is incompatible with the existence of
> 7   wrongful intent.
>
> 8   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> 9   The *Mayberry* defense has two components, one subjective, and
> one objective.  The subjective component asks whether the
> 10   defendant honestly and in good faith, albeit mistakenly, believed
> that the victim consented to sexual intercourse.
>
> 11
>
> 12   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> 13   In addition, the defendant must satisfy the objective component,
> which asks whether the defendant's mistake regarding consent was
> reasonable under the circumstances.

14

15   People v. Williams, 4 Cal.4th 354, 360-61 (1992) (footnote omitted).  The crime of forcible rape,

16   which penalizes an act of sexual intercourse that was "accomplished against a person's will by

17   means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury" is a

18   general intent crime that includes a "wrongful intent."  Mayberry, 15 Cal.3d at 155.  The crimes

19   charged in this case penalize a sexual act "where a person is incapable, because of a mental

20   disorder or developmental or physical disability, of giving legal consent, and this is known or

21   reasonably should be known to the person committing the act."  Cal. Penal Code § 261(a)(1); see

22   also Cal. Penal Code §§ 286(g), 288a(d) & (g), 289(b) (containing the "known or reasonably

23   should be known" language in defining other sex offenses).

24          Several lower courts have defined rape of an intoxicated person, which penalizes

25   sexual acts "where a person is prevented from resisting by any intoxicating . . . substance, and

26   this condition was known or reasonably should have been known by the accused" as a general

1  intent crime as well.  See People v. Dancy, 102 Cal.App.4th 21, 36 (2002).  In People v.

2  Linwood, 105 Cal.App.4th 59 (2003), the court also defined the crime as being one of general

3  intent, but observed that the statute

> uses a criminal negligence standard . . . on the accused's
> knowledge of the disabling intoxication.  Under the criminal
> negligence standard, knowledge of the risk is determined by an
> objective test: [I]f a *reasonable person* in defendant's position
> would have been aware of the risk involved, then defendant is
> presumed to have had such an awareness.

8  Id. at 70 (emphasis in original).  As the California Supreme Court has observed, "[u]nder section

9  20, criminal negligence may be sufficient to make an act a criminal offense, without a criminal

10 intent."  People v. Sargent, 19 Cal.4th 1206, 1215 (1999).  Whether rape of a person incapable of

11 consent is a general intent statute with the mental state to be determined by a criminal negligence

12 standard or is one of those crimes that combines an act and criminal negligence rather than an act

13 and wrongful intent, it incorporates the "reasonable person" standard that appears to make a

14 defendant's subjective knowledge or belief irrelevant.  Because the Mayberry defense includes a

15 subjective component, it may be incompatible with the crimes charged in this case.  See also

16 People v. Velez, 144 Cal.App.3d 558, 565-66 (1983) (mistake of fact instructions not proper in

17 case of involuntary manslaughter based on negligence).  Petitioner has presented nothing but his

18 reading of Giardino[3] to suggest that the California Supreme Court would find a Mayberry

19 instruction appropriate in a case such as this.  In light of the apparently different mental states,

20 /////

21 however, this court is not persuaded that the state's high court would necessarily choose the

---

23  [3]  Petitioner does cite People v. Dolly, 239 Cal.App.2d 143, 146 (1966), in which the
24 Court of Appeal for the Second Appellate District suggested, in dictum, that an honest and
    reasonable belief in a brain damaged woman's ability to consent to intercourse might be a
    defense.  When Dolly was decided, the statute did not include the "known or reasonably should
25 be known" standard, but instead defined the offense as "where a person is incapable, through
    lunacy or other unsoundness of mind, whether temporary or permanent, of giving legal consent."
26 Cal. Pen. Code § 261(a)(1), Historical & Statutory Notes, 1970 & 1983 amendments.

1   Giardino approach over that of the Court of Appeal in this case.

2   IV.  The Exclusion Of Defense Testimony

3          In general, a state court's evidentiary ruling is not subject to federal habeas review

4   unless the ruling violates federal law, either by infringing upon a specific federal constitutional or

5   statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by

6   due process. See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d

7   918, 919-20 (9th Cir. 1991).   Petitioner argues that the two rulings discussed below, see pages

8   13-18 infra, deprived him of his right to present a defense.

9          The Supreme Court has explored a criminal defendant's right to present a defense

10   in a cluster of cases.  In Washington v. Texas, 388 U.S. 14 (1967), the Court struck down a

11   Texas statute that forbade a defendant from calling a co-perpetrator as a witness.  The Court said:

12          We hold that the petitioner in this case was denied his right to have
           compulsory process for obtaining witnesses in his favor because
13          the State arbitrarily denied him the right to put on the stand a
           witness who was physically and mentally capable of testifying to
14          events that he had personally observed, and whose testimony
           would have been relevant and material to the defense.

15

16   Id. at 22.

17          In Chambers v. Mississippi, 410 U.S. 284 (1973), the Court reversed Chambers'

18   conviction because the trial court excluded as hearsay testimony from several witnesses prepared

19   to testify that a man named McDonald had confessed to the murder with which Chambers was

20   charged.  The Court observed:

21          Few rights are more fundamental than that of an accused to present
           witnesses in his own defense.  In the exercise of this right, the
22          accused, as is required of the State, must comply with established
           rules of procedure and evidence designed to assure both fairness
23          and reliability in the ascertainment of guilt and innocence.
           Although perhaps no rule of evidence has been more respected or
24          more frequently applied in jury trials than that applicable to the
           exclusion of hearsay, exceptions tailored to allow the introduction
25          of evidence which in fact is likely to be trustworthy have long
           existed.  The testimony rejected by the trial court here bore
26          persuasive assurances of trustworthiness and thus was well within

10

> the basic rationale of the exception for declarations against interest. That testimony was also critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.

Id. at 302 (internal citations omitted).

In Rock v. Arkansas, 483 U.S. 44 (1987), the Court considered a ruling permitting the defendant to testify about killing her husband, but not to describe what she had remembered during hypnosis.

> Just as a State may not apply an arbitrary rule of competence to exclude a material defense witness from taking the stand, it also may not apply a rule of evidence that permits a witness to take the stand, but arbitrarily excludes material portions of his testimony.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> Of course, the right to present relevant testimony is not without limitation. The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'

Id. at 55-56.

In United States v. Scheffer, 523 U.S. 303 (1998), the Court considered Military Rule of Evidence 707, which made polygraph evidence inadmissible in court-martial proceedings. As it had in Rock, the Court examined the accommodation between a defendant's right to present a defense and the government's interests in ensuring that reliable evidence is presented and avoiding litigation collateral to the purpose of the trial. Scheffer, 523 U.S. at 308-09. The Court observed that rules excluding evidence "do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." Id. at 308 (internal quotations omitted). The Court found the situation before it different than those in Washington, Chambers, and Rock, because

/////

/////

/////

11

> [h]ere, the court members heard all the relevant details of the
> charged offense from the perspective of the accused, and the Rule
> did not preclude him from introducing any factual evidence.
> Rather, respondent was barred merely from introducing expert
> opinion testimony to bolster his own credibility.  Moreover, in
> contrast to the rule at issue in *Rock*, Rule 707 did not prohibit
> respondent from testifying on his own behalf; he freely exercised
> his choice to convey his version of the facts to the court-martial
> members.

Scheffer, 523 U.S. at 317.

The Court's most recent examination of a defendant's right to present a defense is

Holmes v. South Carolina, ___ U.S. ___, 126 S.Ct. 1727 (2006).   In that case, the South Carolina

court had excluded evidence that another person had committed the murder with which Holmes

was charged because the strength of the prosecution's forensic evidence meant, in its view, that

the proffered third party culpability evidence did not raise a reasonable inference as to Holmes'

innocence.  The Court acknowledged that

> well-established rules of evidence permit trial judges to exclude
> evidence if its probative value is outweighed by certain other
> factors such as unfair prejudice, confusion of the issues, or
> potential to mislead the jury.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> [T]he constitution permits judges to exclude evidence that is
> repetitive . . , only marginally relevant or poses an undue risk of
> harassment, prejudice, [or] confusion of the issues.

Id. at 1732.  It found, however, that "no logical conclusion can be reached" regarding the strength

of the defense evidence if a court evaluates only the prosecution's evidence in determining the

admissibility of defense evidence.  Id. at 1735; see also Chia v. Cambra, 360 F.3d 997, 1003 (9th

Cir. 2004), cert. denied sub nom. Lewis v. Chia, 544 U.S. 919 (2005) (court must balance

importance of excluded evidence against state's interest in exclusion; court erred in excluding

co-conspirator's statements exculpating petitioner); Wood v. State of Alaska, 957 F.2d 1544,

1551 (9th Cir. 1992) ("Even though the evidence is relevant, it may properly be excluded if its

probative value is outweighed by other legitimate interests.").

A.  Dr. Williamson's Testimony Concerning Petitioner's Retardation

The prosecutor filed a motion in limine, seeking to exclude testimony from psychologist Phyllis Williamson about petitioner's developmental disability.  RT 2; CT 224-225.1.  At the hearing on the motion, Dr. Williamson testified that in March 1997, while on the staff of Alta Regional Center, she evaluated petitioner, who had been referred for an assessment of treatment needs and recommendations for housing.  RT 77.  She determined that he was functioning within the mild range of mental retardation and that there had been deterioration or damage since his assessment in 1990; her diagnosis was "persistent dementia or organic brain damage . . . associated with a cognitive impairment."  RT 79.  This organic brain damage was the result of drug and alcohol abuse.  RT 91.

Dr. Williamson did not believe that there would be significant improvement in petitioner's brain damage or cognitive reasoning abilities over a period of two years.  RT 79-80.  Someone with this condition might not be able to recognize cues from another person, but the impact of the condition could be minimized through training.   RT 81, 99, 102.

The doctor acknowledged that she might have used additional assessment tools had she been asked to evaluate petitioner's ability to perceive cues from other people.  RT 89.  Indeed, she did not evaluate how petitioner's organic brain damage and mild mental retardation might have affected his ability to perceive Deanna C.'s characteristics.  RT 91-92.   She also acknowledged that training could improve petitioner's ability to perceive another person's level of functioning.  RT 92.   She recognized that had petitioner been placed in Alta Regional Center in 1997, it is likely he would have received "empathy training, formal sort of programs that focus on . . . how to relate to other people, how to put yourself in other people's shoes. . . ."  Because she was not aware of what training petitioner had received in the two years since her evaluation of him, she could not comment on his cognitive functioning in this area.  RT 94.

/////

/////

After the parties examined, the court posed some questions to Dr. Williamson:

Q: . . . Is there anything that you're stating in your opinion that you form [sic] in March 11, of '97 that is relevant to this Court's determination that Mr. Drew did or did not have the capacity to pick up verbal cues, social cues, facial cues as we talked about in . . . October of '99 . . .?

A: Yes, I think I could only speak how he presented in '97 when I saw him.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Q: Does your diagnosis of organic brain damage . . . have any relevance to Mr. Drew's ability to form a good reasoned judgment about the demeanor, character, attitude, what have you of another person in October of '99 or there are just too many variables between the time of your assessment . . . for you to render an opinion?

A: Specific to Mr. Drew, I wouldn't be able to give an opinion. In general terms I would say an organic disorder. I would assume it is persistence. [sic] It is going to have an impact but in a specific case without assessing it, I wouldn't know.

RT 103-105.

The court excluded the testimony as requested by the prosecution, on the ground that Dr. Williamson's opinion about petitioner's capabilities in 1999 would be speculative.

RT 114.

Petitioner raised the issue on appeal, but the Court of Appeal upheld the ruling:

The trial court acted well within its discretion in concluding that Dr. Williamson's testimony was irrelevant. Dr. Williamson [sic] assessment of defendant took place in 1997. While she characterized defendant's organic disorder as persistent, she also testified that defendant's level of functioning and ability to pick up on cues from others would depend on the training and life experiences he had received. She had no information about these matters and stated explicitly that she had no opinion about defendant's ability in October 1999 to make social cue assessments. The fact that defendant was mildly retarded was of no relevance without evidence of how that disability manifested itself and affected defendant's behavior. Dr. Williamson had no such information, and any inferences would have been speculative. Consequently, the court properly deemed Dr. Williamson's testimony irrelevant.

14

> Contrary to the implications in defendant's argument, the court did not make a general ruling forbidding defendant from presenting evidence of his own disabilities.  Instead, the court's ruling was limited to the offered testimony, that of Dr. Williamson.  If defendant had other, relevant evidence to present, he was free to do so.  In fact, after the jury's verdict, the court appointed counsel to assist defendant with a possible motion for new trial based on ineffective assistance of counsel for failing to adduce this type of evidence.  However, upon completing his investigation, the attorney determined that no basis for such a motion existed.

Answer, Ex. E at 5-6.

In this proceeding, petitioner argues that exclusion of Dr. Williamson's testimony forced petitioner to rely only on "his own garbled account of his condition" and undercut his ability to present his defense of mental disability to the jury.

The state Court of Appeal did not unreasonably determine the facts or apply the law in upholding the exclusion of evidence.  As in Scheffer, petitioner was not restricted in his presentation of factual evidence about the offenses, but rather was prohibited from calling an expert witness whose testimony was only marginally relevant.  Indeed, as Dr. Williamson herself testified, while petitioner's mental condition would not have improved in the two years between her evaluation and the crimes, his ability to understand and act upon social cues might have improved with training; she was, however, not aware whether he had been given any such training after her evaluation.  The most she could say was that petitioner's "organic disorder" would persist, but she could not evaluate its impact on his ability to comprehend Deanna C.'s limitations.  RT 103-104.  It was that impact, not the fact of the retardation in and of itself was relevant to the jury's task.  As the Supreme Court noted in Scheffer, the trial court was free to exclude this "marginally relevant" opinion testimony designed "to bolster [petitioner's] own credibility."

Moreover, the evidence had the potential to confuse the jury.   Because Dr. Williamson could not speak to petitioner's ability to understand Deanna C.'s limitations at the time of the offense, the jury would be faced with determining the relevance of this evidence, if

1     any, with little expert guidance.  There was no federal constitutional error in its exclusion.

2                 B.  <u>Exclusion Of Evidence Of Deanna's Molestation By Her Stepfather</u>

3            Petitioner filed a motion to introduce evidence that Deanna C. told police that she

4     had been sexually abused by her stepfather and for that reason had run away from home on

5     October 9, 1999, when petitioner encountered her at the grocery store.  CT 236-242.  He argued

6     that this evidence would show she had the ability to reject, and inferentially, consent to, sexual

7     activity.  <u>Id</u>.

8            During argument on the motion, counsel quoted the police report from October

9     10, when Deanna told police, "Burto [the stepfather] touched me.  I don't like it.  Every time my

10    mom is gone."  RT 43.  The defense also directed the court to Deanna's MDIC[4] interviews, one

11    in connection with this case, the other in connection with the prosecution of her stepfather.  RT

12    43-44.

13           In the course of the interview about this case, the interviewer asked Deanna if

14    anyone else had done anything similar to her.  She said:

15               My, uh – my stepdad did. . . .Berto.  Everytime my mom leaves, he
                  always touches me. . . . I don't like it.

16

17    CT 533.  Deanna said her stepfather touched her "'gina" with his "thing" and "my mom got mad.

18    And he was mad at me.  I didn't do anything."  CT 533-534.  There were three incidents with her

19    stepfather.  CT 542.

20           When Deanna was interviewed about her stepfather's molestation, she said she

21    did not tell anyone about the molestation "[be]cause – um–afraid my mom might –

22    might—um–my mom get mad at him–get mad at him."  CT 653-654.

23           After reviewing these materials, the trial court denied the motion:

24               . . . [T]he fundamental issue here is not whether or not this lady
                  consented to conduct involving Roberto or left the home to avoid

25

26         [4]  MDIC stands for Multi-Disciplinary Interview Center.

conduct of some type involving Roberto or indeed even acquiesced
or did not acquiesce [in] the conduct involving Mr. Drew and Mr.
Iverson.

The fundamental issue is whether or not she understood the nature
of the touching involved, the touching that she did not like.

For example, did it result in pregnancy?  Is it a manifestation of
intimacy between two people?  Is it the type of conduct which
diseases can be transmitted by engaging in?

Is it the type of conduct that society would normally sanction and
human behavior would normally occur of this character in the
context of a relationship of mutual affection between the parties?

Is it her capacity to do that which is at issue?  And so her leaving
Roberto's home for the reasons discussed has little, if any,
relevance to whether or not she had that capacity.

Leaving because she did not want to be touched or being afraid to
be struck, for example, lends very little light on the issue of
whether or not she actually understood the nature of the act
involved.

So the probative value in the Court's perspective is slight to
nonexistent, and I believe there is potential undue prejudice here.

RT 363-364.  The Court of Appeal rejected petitioner's challenge to this ruling:

The fact that the victim was abused by her stepfather and ran away
from home one week later has no relevance to whether the victim
had the capacity to disobey direct orders from defendant, run away,
or otherwise refuse to engage in sexual activities.  And it could
well have been that the victim ran away after having been unable to
refuse her stepfather's advances, fearful that she would be unable
to refuse in the future, thus reducing further the probative value of
the event.  The party offering evidence has the burden of showing
preliminary facts necessary to establish relevance. . . .Essentially,
the two events have little in common, and the court properly
concluded the runaway episode was irrelevant to the issues at hand.

Answer, Ex. E at 12-13.  Petitioner argues that this ruling also violates his right to present a

defense.

Capacity to consent, as that term in used in California Penal Code § 261(a)(1),

"presupposes an intelligence capable of understanding the act, its nature, and possible

consequences."  People v. Lewis, 75 Cal.App.3d 513, 519 (1977) (internal quotation omitted).

1   The evidence that Deanna C. had run away from home to avoid her stepfather's molestation did

2   not suggest that she understood "the nature and possible consequences" of sexual activity.   She

3   told interviewers that she did not like her stepfather's actions, but it is not clear from her

4   statements whether this dislike stemmed from her mother's and stepfather's anger or from other

5   feelings of unease.   This reaction did not shed any light on Deanna C.'s comprehension of the

6   consequences of sexual activity or on her ability to consent to it in light of that comprehension.

7           Moreover, this evidence, only marginally relevant, if at all, on the question of

8   capacity, had the potential to confuse the jury by injecting facts unrelated to the charged offenses

9   into its deliberations.   The state Court of Appeal did not apply federal law unreasonably in

10   determining that the exclusion of this evidence did not deny petitioner the right to present his

11   defense.

12   V.   Prosecutorial Misconduct

13           In rebuttal, the prosecutor addressed defense counsel's argument about petitioner's

14   mental status.   See, e.g., RT 885.   She said:

15       [W]e heard about Mr. Drew, you know, in a mental hospital and
         Mr. Drew hearing voices and Mr. Drew in a group home.
16
17       Well, let's put all that in perspective.   First of all, remember how
         that changed.   Mr. Drew originally testified that he was in a group
         home as of October of 1999, and then when actually confronted
18       with it, he had to change that to 1997.   So that was his mental status
         in 1997, not October of 1999.
19
20       October of 1999 we know that Mr. Drew is living with his mom.
         When he's not living with his mother, he's living at his girlfriend's.
         He's running around doing his own thing.   He's not in any type of
21       hospital or group home or anything else.   He's taking his
         medication, the medication that he's been prescribed so he doesn't
22       hear the voices.

23       Well, let's see, if they prescribed him the medication to make it so
         he's mentally stable and he's taking his medication, because he told
24       us he was, then what mental status are we talking about in 1999?
         None.   Normal.
25
26       There hasn't been one shred of evidence that any of the stuff that
         you heard about before, Dr. Williamson or the Alta or the group

18

> home or the hearing voices or the medication, there hasn't been one
> person come in here and tell you that any of whatever he had going
> on before would affect his ability to perceive the defects in Deanna.
> Not one person said that.
>
> So what he wants you to do is he wants you to fill in that gap for
> him and to speculate —

RT 908.  Defense counsel objected at that point and the parties approached the bench.  Id.  After

the jury had gone home for the evening, the court gave counsel the opportunity to put his

objection on the record.  RT 910.  Counsel noted that he had been precluded from presenting Dr.

Williamson's testimony, which rendered the prosecutor's argument particularly egregious.  RT

911.

> The court said:
>
> One, of course, it is improper to comment on the absence of
> evidence.
>
> And, two, in this instance, it was not a comment with regard to
> whether or not evidence exists.  It was a comment directed to
> whether or not such evidence had been produced on the stand.
>
> And, three, Williamson, of course, ultimately opined that she had no
> opinions in regard to his capacity in October of '99.
>
> Four, I would just observe that the in limine motion the Court ruled
> upon was directly precipitating Dr. Williamson, and it didn't go
> broader than that.

RT 911.  The Court of Appeal also rejected petitioner's challenge:

> As the California Supreme Court explained, a prosecutor commits
> misconduct by referring to facts not in evidence because such
> statements tend[] to make the prosecutor his own witness–offering
> unsworn testimony not subject to cross-examination.  It has been
> recognized that such testimony, although worthless as a matter of
> law, can be dynamite to the jury because of the special regard the
> jury has for the prosecutor, thereby effectively circumventing the
> rules of evidence.  Statements of supposed facts not in evidence . . .
> are a highly prejudicial form of misconduct, and a frequent basis for
> reversal.
>
> Similarly, misconduct occurs when a prosecutor misstates or
> mischaracterizes the evidence.

/////

1
2
3
4

> Here, however, the prosecutor did not engage in such argument. She responded to defense counsel's claims of mental incapacity and noted that defendant had not presented any evidence that he suffered from a mental disability in October 1999.  A prosecutor may properly point out the absence of evidence to support defendant's claim.

5   Answer, Ex. E at 8-9 (internal quotation, citation omitted).

6          A prosecutor's argument will not raise a federal constitutional claim if it "did not

7   manipulate or misstate the evidence, nor . . . implicate other specific rights of the accused . . . ."

8   Darden v. Wainwright, 477 U.S. 168, 181-82 (1986).  While it may be error for a prosecutor to

9   comment on the absence of evidence when the prosecutor has successfully prevented the defense

10   from placing the evidence before the jury, Paxton v. Ward, 199 F.3d 1197, 1216-18 (2d Cir.

11   1999),

12
13

> a prosecutor may comment on the absence of evidence even when such evidence was available, but inadmissible, so long as there is sufficient evidence to support the prosecutor's version of events.

14   Menendez v. Terhune, 422 F.3d 1012, 1034 (9th Cir. 2005); Bashor v. Risley, 730 F.2d 1228,

15   1240 (9th Cir. 1984).

16          As the state courts observed, petitioner had presented no evidence of his ability to

17   recognize social cues in 1999, the time of the offense.  Petitioner's claim of underhandedness

18   fails.  Even if Dr. Williamson's testimony had been admitted, she conceded that she could not

19   give an opinion about petitioner's abilities in 1999, which is something the prosecutor could have

20   mentioned, consistent with petitioner's rights.  Moreover, as the prosecutor observed, petitioner

21   had testified he was taking his medication and living at home in 1999.  RT 597, 622, 638.  The

22   state court did not apply clearly established law in an unreasonable fashion in its resolution of this

23   claim.

24          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

25   writ of habeas corpus be denied.

26   /////

1    These findings and recommendations are submitted to the United States District

2  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

3  days after being served with these findings and recommendations, any party may file written

4  objections with the court and serve a copy on all parties.  Such a document should be captioned

5  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6  shall be served and filed within ten days after service of the objections.  The parties are advised

7  that failure to file objections within the specified time may waive the right to appeal the District

8  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9  DATED:  August 28, 2006.

UNITED STATES MAGISTRATE JUDGE

2/drew1454.157

21